## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CRAIG MYLES,                          *
**Individually and as Parent and Next**
**Friend of K.M. and A.M., minors,**       *

    **Plaintiffs**                    *

    **v.**                          *       **CIVIL NO. JKB-15-300**

**RENT-A-CENTER, INC.,** *et al.*,     *

    **Defendants**              *

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Craig Myles brought an action on behalf of himself and his minor children, K.M. and A.M. (collectively, "Plaintiffs"), in the Circuit Court of Maryland for Baltimore County, accusing Rent-A-Center, Inc. ("RAC") and Rent-A-Center East, Inc. ("RAC East") (together, "Defendants") of negligence (Count I); breach of warranty (Count II); violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101 *et seq.* (Count III); and common-law fraud (Count IV).  Plaintiffs' claims arise from a rental-purchase agreement that Myles executed at a Towson, Maryland, Rent-A-Center store:  Plaintiffs allege that (1) Myles leased a purportedly merchantable couch at the store but (2) the couch was in fact infested with bed bugs and (3) the infestation spread into Plaintiffs' apartment, causing them physical and emotional distress.  On February 3, 2015, Defendants removed the action to this Court on diversity grounds.  (ECF No. 1.)

Now pending before the Court is Plaintiffs' Motion for Partial Summary Judgment (ECF No. 88) as to Defendants' liability on Counts II and III.  Also pending is Defendants' Motion for

Summary Judgment (ECF No. 89) on all counts.  The issues have been briefed, and no hearing is

required, *see* Local Rule 105.6 (D. Md. 2014).  For the reasons explained below, Plaintiffs'

motion will be DENIED, and Defendants' motion will be GRANTED IN PART and DENIED

IN PART.

## I.    *Factual Background*[1]

On November 4, 2014, Plaintiff Myles visited a Rent-A-Center store, operated by RAC

East, located at 6969 Loch Raven Boulevard in Towson, Maryland.  (ECF No. 89–3 at 1-2.)

Having recently moved into a new apartment, Myles found himself in need of a couch.  (ECF

No. 92–2 at 7.)  He had visited another furniture store and was feeling "a little sticker shocked."

(*Id.*)  While driving home, he noticed an Aaron's rental store and a Rent-A-Center:  he mentally

"[f]lipped a coin" and decided to stop by the Rent-A-Center.  (*Id.*)  Myles recalled that, once

inside, he met with a salesman named "Mike."  (*Id.*)  Defendants have confirmed that a Mike

Boyd worked at the Loch Raven store in November 2014; although Boyd testified that he had no

recollection of assisting Myles on November 4 (ECF No. 92–3 at 4-5), the store manager, David

Johnston, testified that Boyd "very likely" assisted with the transaction (ECF No. 92–4 at 13).

According to Myles, "Mike" showed him the couch that he eventually agreed to lease—a

brown sectional sofa with three cushions, including a chaise.  (ECF No. 92–2 at 8.)  Myles

testified that the couch "looked nice" and appeared new, but for a small burn mark on the back of

one cushion; he added that "Mike" told him the couch was "really nice, in great condition," and

---

[1] At the summary-judgment stage, the facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).  Because both parties here have moved for summary judgment, the Court has evaluated each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir.1997)).  Having analyzed the parties' arguments and the relevant authorities, the Court has determined that Defendants are partially entitled to judgment as a matter of law.  Plaintiffs, conversely, are not entitled to judgment at this time, as factual questions material to their claims remain in dispute.  Throughout this Memorandum, the Court identifies those factual questions and explains how their ultimate resolution (at a forthcoming jury trial) will bear on the outcome of this litigation.

that he would "probably love it." (*Id.*) Myles signed a rental-purchase agreement, which provided for weekly payments of $29.99 with an early purchase option:  the agreement further specified that Myles could terminate without penalty at the end of any weekly rental term simply by returning the couch to Rent-A-Center. (ECF No. 88–5.)

Myles took delivery of the couch on November 8, 2014. (ECF No. 92–2 at 9.) Within two hours after the delivery, Myles spotted an insect crawling on the couch. (*Id.* at 14.) Through Internet research, Myles concluded that the insect was a bed bug. (*Id.* at 11.) He attempted several times that evening to call the Rent-A-Center store, but no one answered the phone. (*Id.* at 12.) He then undertook self-help treatment measures:  he sprayed his living room with a retail bed-bug spray; he sprinkled diatomaceous earth on the couch cushions; and he set two chemical foggers ("bug bombs"). (*Id.* at 14.) Fearful of spreading the infestation throughout his apartment, Myles set up his "pallet" (a "comforter or several comforters [that] simulate a bed") "right in front of the couch," and he slept there that night. (*Id.*) He received approximately ten bites. (*Id.* at 18.)[2]

The following Monday, Myles contacted "Mike" at the Loch Raven store; "Mike" expressed "disbelief" at the situation and indicated that Rent-A-Center would "send somebody out to pick up the couch and come check it out." (*Id.* at 19.) Later that day, a "lady and a gentleman" visited Myles's apartment; according to Myles, they "saw bed bugs on the couch. (*Id.* at 20.)[3] Myles claims he then spoke with "Mike" on the phone and that "Mike" told him a third-party pest-control company, Terminix, would need to verify whether the bugs were

---

[2] Myles's young children, Plaintiffs K.M. and A.M., were staying with their godmother that weekend; however, they returned to Myles's apartment on November 10, and within a couple of days, the children had also suffered bed-bug bites. (ECF No. 92–2 at 13.)
[3] The "lady," Amber Blake Johnson, recalled that the "gentleman," Dante Johnson, saw bed bugs; she admitted that she did not see any. (ECF No. 89–8 at 6.) But Dante testified that he had no recollection of visiting Myles's apartment with Amber. (ECF No. 89–9 at 14-15.)

attributable to Rent-A-Center.  (*Id.*)  Myles claims he "got a little bit nervous," concerned that Rent-A-Center would retrieve the sofa only to disclaim any liability:  therefore, he told the store employees to "just leave it here until Terminix comes." (*Id.*)[4]

While Myles waited on Terminix, he hired a separate company—Home Paramount Pest Control—to inspect his apartment.  In a report dated November 11, 2014, Home Paramount inspector Lewis Bellamy, Jr., noted that a "full bedbug inspection was done throughout the house" and that "bedbugs were found only on the couch that was purchased from the rental company." (ECF No. 88–7 at 2.)  Three days later, Terminix's technician, Sonny Hall, inspected the apartment; he found four adult bed bugs, seven eggs, and three nymphs on the "sofa/loveseat," but he found no further evidence of bed bugs in the apartment.  (ECF No. 88–8 at 2.)

On November 18, 2014, following the Terminix inspection, Myles returned to the Loch Raven store.  He testified that "Mike" gave him a refund and told him that Rent-A-Center could retrieve the couch; however, the store would not pay for pest treatment unless Myles executed a release.  (ECF No. 92–2 at 29.)  Myles thought this proposition was "ludicrous," and he told "Mike" he would "just think about it." (*Id.* at 30.)  Myles further testified that (1) "Mike" told him someone would be out to retrieve the couch within a couple of days but (2) no one from Rent-A-Center ever collected the couch or otherwise contacted him. (*Id.*)  David Johnston, however, testified that his team attempted at least four times to retrieve the couch but that Myles refused their assistance.  (ECF No. 92–4 at 6-7.)

The ultimate disposition of the couch is somewhat unclear.  Myles recalled that he arranged for a "gentleman in [his] neighborhood that picks up things on eviction day" to remove the couch.  (ECF No. 92–2 at 30, 33.)  Mike Boyd, however, testified that he and another

---

[4] In this respect, Myles's recollection differs somewhat from that of Amber Blake Johnson.  According to Amber, she and Dante Johnson were initially dispatched to *inspect* the couch; however, they could not actually *retrieve* the couch until Terminix completed a separate inspection.  (ECF No. 89–8 at 6.)

Rent-A-Center employee called "Darnell" eventually retrieved the couch and "dumped it." (ECF No. 92–3 at 6.) Whatever became of the couch, it is evidently no longer in Plaintiffs' apartment—and by February 2015, after Myles hired a company called ABC Pest to steam-clean the apartment, the infestation was seemingly resolved. (ECF No. 92–2 at 37.)

Myles brought suit in state court on December 22, 2014. (ECF No. 3.) Defendants removed the action to this Court on February 3, 2015 (ECF No. 1), and they thereafter moved to dismiss Counts III and IV (ECF No. 12). The Court denied that motion in an Order dated July 7, 2015 (ECF No. 19), and the case proceeded to discovery. Following the close of discovery, Plaintiffs filed the pending Motion for Partial Summary Judgment (ECF No. 88); shortly thereafter, Defendants filed their Motion for Summary Judgment (ECF No. 89). Both motions are fully briefed and are ripe for decision.

## II.   *Standard of Review*

When faced with cross-motions for summary judgment, the Court must consider each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The Court will grant summary judgment to a party who demonstrates that (1) there is no genuine dispute as to any material fact and (2) that party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. Moreover, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of its pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

### III. *Plaintiffs' Claims as Against RAC*

Defendants argue that RAC is entitled to summary judgment on all counts because Myles entered a rental-purchase agreement with RAC East (a RAC subsidiary) but not with RAC itself. (*See* ECF No. 89 at 26-27.) Appended to Defendants' Motion for Summary Judgment is an affidavit by Anthony Wagstaff, district manager for RAC East, in which Wagstaff avers that (1) RAC East owned the couch at issue in this case; (2) RAC East operates the Loch Raven store, while RAC has never operated that store; (3) RAC East employed the employees who worked at the Loch Raven store during the relevant time period; and (4) RAC East (but not RAC) was party to the rental-purchase agreement. (ECF No. 89–3 at 2.)

"It is well settled that '[a] corporation exists as a legal entity separate and distinct from its corporate shareholders.'" *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 515 (D. Md. 2013) (alteration in original) (quoting *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1047 (4th Cir. 1988)). "Therefore, '[u]nder the doctrine of limited liability, a shareholder—*including a corporate parent*–may not be held liable for the acts of a corporation.'" *Id.* (alteration in original) (emphasis added) (quoting *Allen v.*

6

*Bank of Am. Corp.*, Civ. No. CCB-11-33, 2011 WL 3654451, at *4 (D. Md. Aug. 18, 2011)); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." (citation omitted)).   Of course, there are analytical mechanisms through which a tort plaintiff can attempt to pin liability on a parent corporation, *e.g.*, through veil piercing or by establishing the existence of an actual-agency relationship with respect to the allegedly tortious conduct.   However, Plaintiffs here advance no such argument: rather, they contend that RAC, "regardless of actual ownership or operation of the Towson RAC store, could be found liable to Plaintiffs on an apparent agency theory."  (ECF No. 94 at 17.)

Under Maryland law, the "doctrine of apparent agency can be expressed in three elements":  (1) the apparent principal must have created or acquiesced in "the appearance that an agency relationship existed"; (2) the plaintiff must have "believe[d] that an agency relationship existed and rel[ied] on that belief in seeking the services of the apparent agent"; and (3) the plaintiff's "belief and reliance" must have been "reasonable."   *Bradford v. Jai Med. Sys. Managed Care Org., Inc.*, 93 A.3d 697, 707 (Md. 2014).   The doctrine of apparent agency thus includes both subjective and objective elements:

> [A] plaintiff must show that the plaintiff subjectively believed that an . . . agency relationship existed between the apparent principal and the apparent agent, and that the plaintiff relied on that belief in seeking [services] from the apparent agent. But the plaintiff must also show that the apparent principal created or contributed to the appearance of the agency relationship and that the plaintiff's subjective belief was "justifiable" or "reasonable" under the circumstances—an objective test.

*Id.*

In this case, there is some evidence from which a reasonable jury could conclude that RAC created or acquiesced in the appearance of an agency relationship.  The Loch Raven store was evidently branded simply as a Rent-A-Center store (not as a Rent-A-Center *East* store); the

rental-purchase agreement identifies "Rent-A-Center" as lessor; and Plaintiffs' counsel notes in his brief that the store lacked any conspicuous disclaimers (though, unhelpfully, counsel fails to supply an affidavit or any admissible evidence in support of this statement). Given that the "existence of an agency relationship is a factual matter," *Jackson v. 2109 Brandywine, LLC*, 952 A.2d 304, 322 (Md. Ct. Spec. App. 2008), the Court might have been inclined to reserve the question of apparent agency for the jury—that is, had Plaintiffs adduced evidence corresponding to the second and third elements of the test.

But Plaintiffs adduced no such evidence. Indeed, there is nothing in Myles's deposition that would suggest he selected the Loch Raven store in reliance on RAC. Nor did he supply an affidavit, a declaration, or any other evidence tending to show any such reliance. Rather, in explaining why he visited the Loch Raven store on November 4, 2014, Myles testified that he spotted the store—as well as an Aaron's rental store—while driving home from another furniture store; that he "didn't have any intention of stopping anywhere else"; and that he "just had the thought in [his] mind to stop in." (ECF No. 92–2 at 7.) Myles further testified that, in choosing between Rent-A-Center and Aaron's, he mentally "[f]lipped a coin"; he added that Rent-A-Center was "on the right side of the road, so it was just easier," but there was "[n]o particular logic behind it." (*Id.*) This is not the testimony of an individual who selected a retailer in conscious reliance on the brand: this is the testimony of an individual who was wholly indifferent to the brand and merely dropped by the store on a whim. But the burden is on Plaintiffs to provide a sufficient evidentiary basis from which a jury could find that *each* element of the apparent-agency doctrine is satisfied: they have not done so here.

*DiFederico v. Marriott International, Inc.*, 130 F. Supp. 3d 986 (D. Md. 2015), is instructive. In that case, Judge Titus of this District rejected plaintiffs' attempt to impute liability

for an alleged wrongful-death tort occurring at the Marriott Islamabad Hotel to Marriott International, Inc., the global franchisor.  In addressing apparent agency, Judge Titus explained that there was no evidence the decedent "made his decision to stay at the Hotel as a result of the existence of the Marriott brand or his reliance upon the adequacy of Marriott's security procedures." *Id.* at 992-93.  Thus, even had Judge Titus "embrace[d] the view of those cases that allow a recovery on the basis of apparent authority or agency by estoppel," there was no "factual basis in this case upon which such a recovery could be made." *Id.* at 993; *cf. Stenlund v. Marriott Int'l, Inc.*, Civ. No. GJH-14-1544, 2016 WL 1203749, at *9 (D. Md. Mar. 22, 2016) ("[U]nder Maryland law, the fact that [hotel] used [international franchisor's] trade name and trademarks . . . would not satisfy the objective element required to demonstrate the existence of an apparent agency.").  *But see Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 167 (4th Cir. 1988) (finding sufficient evidence to support submission of apparent-agency theory to jury where, *inter alia*, wife testified that she and her husband had previously stayed at Holiday Inns and that they used a Holiday Inn directory to locate another motel after they learned that their preferred Holiday Inn was fully occupied, and where husband testified that he "did not know the difference between a franchise inn and a company owned inn" and "would be greatly surprised to find out that Holiday Inns was not involved in the operation" of the motel at issue).

Here, as in *DiFederico* (and unlike in *Crinkley*), there is no factual basis from which a reasonable jury could conclude that Myles chose the Loch Raven store in reliance on the RAC brand—or for any reason other than pure convenience (and a desire for a cheap sofa).  Since Defendants have produced unrefuted evidence showing that RAC has no direct ties to the Loch Raven store, and since Plaintiffs have failed to advance a cognizable apparent-agency theory,

9

RAC is entitled to JUDGMENT AS A MATTER OF LAW on each count in Plaintiffs' Complaint and will be TERMINATED from these proceedings.

### IV.   Plaintiffs' Fraud Claim as Against RAC East (Count IV)

In Count IV, Plaintiffs contend that Defendants "concealed the bed bug infestation and represented that the Couch was of good quality, merchantable and fit for its ordinary and intended use" so as to induce Myles to "apply for and accept a Rental-Purchase Agreement for the Couch." (ECF No. 3 ¶ 88.)  Further, Plaintiffs contend that Defendants were "aware that the Couch was not, in fact, of good quality" but was instead "infested with bed bugs," or, alternatively, that Defendants "deliberately failed to perform an inspection with the conscious purpose to avoid learning the truth about the infestation." (*Id.* ¶¶ 89-90.)  Plaintiffs conclude that this alleged intentional concealment amounted to fraudulent misrepresentation/nondisclosure.

Under Maryland law, a plaintiff seeking to prove fraud must show that

(1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005).  Moreover, the plaintiff must prove each of these elements with clear-and-convincing evidence.  *Price v. Berman's Auto., Inc.*, Civ. No. 14-763-JMC, 2015 WL 5720429, at *4 (D. Md. Sept. 28, 2015); *see also Cunney v. Patrick Commc'ns, LLC*, Civ. No. JKB-13-2519, 2016 WL 3227994, at *12 (D. Md. June 13, 2016) (explaining that, while at the summary-judgment stage the Court must view the facts in the light most favorable to the nonmoving party, the Court "must nevertheless consider the plaintiff's ultimate evidentiary burden in determining whether there is a genuine issue of material fact to

hold over for trial" and must therefore "view the evidence presented through the prism of the substantive evidentiary burden" (quoting *Anderson*, 477 U.S. at 254)).

While Plaintiffs may well believe that RAC East has treated them unfairly, and while RAC East may ultimately be held to answer for negligence (a point discussed in detail in Part V, *infra*), Plaintiffs have utterly failed to adduce evidence tending to show that RAC East's agents knowingly or recklessly deceived them. On the contrary, the record is clear that these employees aimed (however successfully or unsuccessfully) to deliver furniture free of pests.

For instance, David Johnston, who served as store manager during the relevant time period, explained that the store's "standard operating procedure" is to clean previously rented items within 24–48 hours of their return:  employees vacuum the furniture and spray it with STERIFAB®, a bactericide/sanitizer.  (ECF No. 92–4 at 5-6.)  Johnston added that he personally inspected every piece of furniture that came back to the store and that if there was "even a hint" of bed-bug activity, "it was off to the dump."  (*Id.* at 17-18.)  Johnston also noted that pest-control technicians visited the Loch Raven store on a monthly basis to check for any evidence of insects.  (*Id.* at 22.)

Jason Parrott, a sales manager, echoed Johnston's testimony:  Parrott explained that the store has a "24-hour policy" pursuant to which all returning furniture "has to be cleaned and sanitized."  (ECF No. 89–5 at 7.)  Parrott noted that store employees use STERIFAB®, which is "supposed to kill any and all types of germs or . . . any debris." (*Id.* at 8.)  Parrott also described the manner in which employees would retrieve merchandise in response to customer complaints about bed bugs:  he explained that they would take the suspect merchandise "right to the dump" and would thereafter "do the full fumigation and [STERIFAB®] the whole vehicle before . . .

do[ing] anything else." (*Id.* at 18.) "We just want to make sure," Parrott testified, "that it's no possible way that we can transfer the issue to something else." (*Id.*)

Similarly, Mike Boyd testified that if an item of furniture was believed to be infested with bed bugs, employees would pick it up and bring it back to the loading dock for David Johnston's evaluation; typically thereafter, they would "put it . . . back onto the truck, and . . . take it out to the dump . . . [and thereafter] bring the truck back and bomb the truck overnight. Then [they would] go out the next morning and spray it down with [STERIFAB®]." (ECF No. 92–3 at 7.) Anthony Wagstaff, the district manager, added that employees would first spray suspect merchandise with STERIFAB® and then dispose of it: "[W]hether it's treated or not," he remarked, "it's trash to us. Once it's . . . discovered to have bed bugs, we consider it trash. It's junk. There's no reason for us to try to recycle that to put it back out for rent." (ECF No. 89–7 at 5.) Dante Johnson, a customer account representative, had a slightly different understanding of the store's policy: he testified that, rather than transporting an infested item to the junkyard, the company would "wind up giving it to [the customer]," ostensibly to avoid any infestation in the company's trucks. (ECF No. 89–9 at 7.) But Johnson's understanding of furniture preparation was similar to that of Johnston and Parrott: "[M]ost of the time," he testified, "if it's not new merchandise, I refurbish it even before it goes into the stock room. . . . What I do is I take [the furniture] and I spray it down, you know, make sure I clean[] it real good, and then I put it in the stock room. . . . But if it's not rent-ready," he added, "I don't load it up. I have to find something else, so I call another store to . . . replace it." (*Id.* at 5.) Amber Blake Johnson described in greater detail the process by which Rent-A-Center employees inspect furniture for insects, and in particular for bed bugs: "We look for any type of droppings . . . or their shells, or any little bugs . . . . We look for them in the cracks. We look for them on the surface, in the

corners, under the flaps, under the cushions, in the zipper parts.  We unzip[] the cushions. . . . We inspect the whole couch."  (ECF No. 89–8 at 6.)

Indeed, Plaintiffs' *own* expert entomologist, Paul J. Bello, testified that Rent-A-Center's documents "support . . . that they are supposed to be delivering bed bug free furniture."  (ECF No. 89–10 at 33.)  "Look at what their policies and procedures are and what they are talking about," he advised.  "Those are efforts to deliver pest free furniture."  (*Id.*)  Bello further opined that it is "irrefutable" that Rent-A-Center aims to provide "bed bug free items."  (*Id.*)  Elsewhere in his deposition, Bello testified:  "I think if you look at their documents that they provided as their policies and procedures they are, in fact, trying to deliver zero bed bugs."  (*Id.* at 38.)

In response to this wealth of evidence tending to undercut Plaintiffs' fraud theory, Plaintiffs present two counterarguments.  First, they posit that a jury could find that Rent-A-Center employees (1) performed an inspection and (2) detected at least one bed bug but (3) elected to rent the couch to Myles anyway.  Plaintiffs base their conjecture on deposition segments in which David Johnston and Dante Johnson opined that Rent-A-Center employees are trained to spot bed bugs and would have detected bugs if, in fact, such bugs appeared on the merchandise within hours of delivery.  (ECF No. 94 at 9.)  Plaintiffs also cite Johnston's admission that he was very profit-oriented.  (*Id.* at 10.)  As for Johnston's and Johnson's puffery, that is at most a scintilla of evidence that is dwarfed by all deponents' express testimony that they would never intentionally supply an infested piece of furniture and by Bello's testimony that Rent-A-Center's policies are designed to prevent infestation.[5]  And as for Johnston's profit admission, here Plaintiffs grossly misconstrue Johnston's testimony.  In fact, Johnston explained

---

[5] Moreover, read in context, Johnston's point was that the team *would have* discovered bed bugs had the couch *in fact* been infested, and therefore, Johnston believes that the infestation was a preexisting condition in Plaintiffs' apartment.  (ECF No. 92–4 at 18-19.)  As discussed below, the Court is not in a position to determine the source of the infestation at the summary-judgment stage.

that his bonus structure was based on profit and that many of his customers were return customers: "That was a huge amount of our business that was return business, followed closely by referrals. I knew that if I sold a piece knowingly bad to somebody that I wouldn't get the return business and I wouldn't get the referral business. I was very, very much oriented on making money." (ECF No. 92–4 at 12.) In other words, Johnston perceived that the best way to achieve profit was to supply quality merchandise and win customer trust.

Plaintiffs' second argument is weaker still: they suggest that, "[n]otwithstanding RAC's policy to inspect for bed bugs . . . no inspection was actually performed." (ECF No. 94 at 10.) Further, Plaintiffs speculate, "RAC understood the risk that previously rented furniture could contain bed bugs," and a "jury could infer that a failure to perform an inspection of a previously leased couch constitutes willful ignorance." (*Id.* at 11.) Plaintiffs base their speculation on a highly selective interpretation of RAC's claim files. (*See* ECF No. 94–16.) But these claim files shed little light on the company's commitment (or lack thereof) to bed-bug prevention and remediation. Of the thirty-nine claim files included in the summary-judgment record (reporting claims arising from transactions at stores across Maryland during a period just shy of fourteen months),[6] seventeen claims were denied in situations in which the customers filed their initial complaints months after taking delivery of RAC's merchandise: the company can hardly be faulted for declining to settle such stale claims, and the mere fact that the claims were presented is not evidence of a raging bed-bug pandemic at Rent-A-Center. Another seven claims were denied either because Terminix found no evidence of bed-bug activity or because Terminix could not determine whether the bed bugs constituted a preexisting condition. Three additional claims

---

[6] According to Paul Bello's supplemental report, Defendants actually produced eighty-three claim files. (*See* ECF No. 94–7 at 2.) The supplemental report includes a spreadsheet with very brief summaries of the claims, but Plaintiffs only produced thirty-eight files for the Court's inspection (some of which files are plainly incomplete). Defendants produced one additional file, corresponding to the single claim (apart from Plaintiffs') pertaining to the Loch Raven store during the relevant period.

were closed due to lack of interest by the customer.   Thus, over two-thirds of the claims in the summary-judgment record cannot seriously be construed as supporting Plaintiffs' theory that RAC willfully fails to inspect its furniture; the remaining claims present at most a mixed narrative.[7]

No reasonable jury could find, on the basis of this record, *clear-and-convincing* proof that RAC East's agents knowingly or recklessly made false representations to Myles (with the requisite fraudulent intent).   RAC East is therefore entitled to JUDGMENT AS A MATTER OF LAW on Count IV.   Furthermore, because Count IV is the only count containing a punitive-damages allegation, Plaintiffs' claim for punitive damages is necessarily DISMISSED.

### V.    *Plaintiffs' Remaining Claims as Against RAC East (Counts I–III)*

Apart from their fraud claim, Plaintiffs accuse Defendants of negligence; breach of express warranty and of the implied warranty of merchantability, Md. Code Ann., Com. Law §§ 2A-210, -212;[8] and violation of the MCPA.   None of these counts require Plaintiffs to prove scienter;[9] moreover, these claims are measured by the conventional preponderance-of-the-

---

[7] Some of these claims resulted in settlement; others were treated as mere reports, as the customers did not seek compensation.  One claim apparently resulted in litigation, the outcome of which is unclear.

[8] In their memorandum in support of their Motion for Partial Summary Judgment, Plaintiffs also allude to the implied warranty of fitness for a particular purpose, Md. Code Ann., Com. Law § 2A-213.  (*See* ECF No. 88–1 at 4.)  However, Plaintiffs neither explain how RAC East's agents "ha[d] reason to know of any particular purpose for which the [couch] [was] required" nor describe how their planned use for the couch differed from the ordinary use of such furniture.  Consequently, Plaintiffs' claim seems to fit more naturally under § 2A-212 (merchantability) than under § 2A-213 (fitness).  *See Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 362, 375 (Md. 2001) ("[T]he particular purpose must be distinguishable from the normal use of the goods; [t]he purpose must be peculiar to the buyer as distinguished from the ordinary or general use to which the goods would be put by the ordinary buyer." (internal quotation marks and citations omitted)); *accord Montgomery v. CSX Transp., Inc.*, Civ. No. SAG-14-1520, 2015 WL 770470, at *5 (D. Md. Feb. 20, 2015); *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 359 (D. Md. 2011).

[9] At several points in their summary-judgment papers, Defendants suggest that Count III (Plaintiffs' MCPA count) requires proof of fraudulent intent.  (*See* ECF Nos. 89 at 22 & 92 at 8.)  In fact, the MCPA makes actionable a range of misrepresentations, both fraudulent and nonfraudulent.  *See Luskin's, Inc. v. Consumer Prot. Div.*, 726 A.2d 702, 718 (Md. 1999) (explaining that, while subsection (9) of Md. Code Ann., Com. Law § 13-301 requires proof of scienter, subsections (1) and (3) do not).  The Court is aware that several older cases from this District suggest that the defendant's actual knowledge of a material defect is an element of an MCPA claim.  These cases rely on a subset of Maryland cases involving the rental-housing market, in which cases Maryland courts have acknowledged that the MCPA does not reach misrepresentations relating to defects arising *after* a lease is executed (ostensibly because landlords might lack notice of such defects).  *E.g.*, *Richwind Joint Venture 4 v. Brunson*, 645 A.2d 1147, 1158-59 (Md. 1994), *overruled in part by Brooks v. Lewin Realty III, Inc.*, 835 A.2d 616 (Md. 2003).  In general, however,

evidence standard, and as such, they are easier to prove (and more likely, for that reason, to survive summary judgment).   Having reviewed the parties' arguments, the Court has concluded that neither RAC East nor Plaintiffs are entitled to summary judgment on Counts I–III:  critical fact questions remain in dispute, and these questions cannot be resolved at the Rule 56 stage.

The first such critical question is perhaps the most elemental:  did the infestation giving rise to Plaintiffs' Complaint originate in the subject couch, or was it a preexisting condition in Plaintiffs' apartment?  The evidence corresponding to this question seemingly favors Plaintiffs' position:  aside from Myles's testimony that he first discovered a bed bug "within a couple of hours" after the couch's delivery (ECF No. 92–2 at 11), two third-party inspectors—Lewis Bellamy, Jr., of Home Paramount and Sonny Hall of Terminix—contemporaneously reported finding bed bugs on the couch (but nowhere else in the apartment).  (*See* ECF Nos. 88–7 & 88–8.)  In his deposition, Bellamy testified that he "looked on the couch and found a couple bed bugs on the couch itself" but that he did not see any bed bugs in the bedrooms.  (ECF No. 92–6 at 7.)  As for Hall, he affirmed that the infestation was "not a preexisting condition"; that he thoroughly inspected the entire apartment; and that the only evidence of bed bugs was on the couch.  (ECF No. 92–5 at 8-9.)  And while Plaintiffs' expert, Paul Bello, did not actually inspect the couch, upon reviewing photographic and video evidence, he opined that the couch likely contained as few as twenty and as many as 100 bed bugs, nymphs, and eggs at the time of delivery.  (ECF No. 89–10 at 49.)

---

Maryland courts have held that to "to incur liability, [defendants] [do] not have to know of the falsity of their representations.  Nor must they have . . . the intent to deceive their purchasers in order to violate the [M]CPA." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 674 A.2d 106, 136 (Md. Ct. Spec. App. 1996), *aff'd*, 695 A.2d 153 (Md. 1997); *accord Consumer Prot. Div. v. Morgan*, 874 A.2d 919, 970 (Md. 2005); *Kamara v. Shapiro Brown & Alt, LLP*, No. 0471, 2016 WL 1064432, at *10 n.7 (Md. Ct. Spec. App. Mar. 17, 2016); *McCormick v. Medtronic, Inc.*, 101 A.3d 467, 493-94 (Md. Ct. Spec. App. 2014); *cf. Reed v. Bank of Am. Home Loans*, Civ. No. PJM 13-3265, 2016 WL 3218720, at *9 (D. Md. June 10, 2016) ("Claims involving misrepresentations or false statements to consumers which are actionable under the MCPA may not necessarily constitute common law fraud.  The MCPA bars a much broader range of 'unfair or deceptive trade practices,' [and] many MCPA claims do not require scienter on the part of the defendant[.]" (footnotes omitted) (citations omitted)).

16

In their memorandum accompanying their Motion for Summary Judgment, Defendants reference an "expert witness who will testify at trial that bed bugs more likely than not came from Plaintiffs' apartment, and not the Couch rented from RAC." (ECF No. 92 at 2.)  Assuming this assertion is true, the Court is puzzled by Defendants' choice not to place an expert report or some other statement by this purported expert into the summary-judgment record:  under Rule 56(c), a party "asserting that a fact cannot be or is genuinely disputed" must generally support that assertion with material in the nature of admissible evidence.  Relatedly, while Defendants proffer David Johnston's testimony that Terminix advised him that (1) they could not confirm the source of the infestation and (2) Myles prevented their technician from inspecting the entire residence, such testimony is inadmissible hearsay and is directly contradicted by Sonny Hall's testimony that he inspected the entire apartment.  (*Compare* ECF No. 92–4 at 19, *with* ECF No. 92–5 at 9.)  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) (explaining that hearsay evidence is "neither admissible at trial nor supportive of an opposition to a motion for summary judgment"); *see also Henslee v. FNU Singleton*, No. 1:13-cv-90-FDW, 2015 WL 4920260, at *4 n.1 (W.D.N.C. Aug. 18, 2015) ("While at the summary judgment stage evidence need not be submitted in a form that would be admissible at trial, '[n]onetheless, the content or substance of the evidence must be admissible.'" (alteration in original) (citation omitted)).

However, Defendants also highlight Hall's testimony that the couch he inspected "was beige, possibly beige, and it looked more like a loveseat type sofa.  It wasn't a real large sofa, to the best of [his] recollection."  (ECF No. 92–5 at 15.)  This testimony is potentially more problematic for Plaintiffs, because the subject couch is a brown sectional with three cushions including a chaise.  Moreover, Myles acknowledged that he had a second, smaller sofa in his

apartment:  as he described it, "[i]t's one . . . cushion, and it just—it's folded—it's two cushions, but they're together.  So when it folds out . . . that one cushion separates into two . . . ."  (ECF No. 92–2 at 5.)  Myles admitted that this small couch, which he kept for his children, would "qualify" as a loveseat if it was bigger.  (*Id.*)  Additionally, neither Hall nor Bellamy could definitively identify a photograph of the subject couch.  (*See* ECF Nos. 92–5 at 20 & 92–6 at 9.)  This is not altogether surprising:  these technicians, who may well view hundreds of pieces of furniture every year, were deposed in March 2016, roughly sixteen months after their inspections at Plaintiffs' apartment.  Nevertheless, based on the evidence in the record, a reasonable jury could conceivably conclude that the source of the infestation is uncertain, and were a jury to so conclude, RAC East could not be held liable for negligence, breach of warranty, or violation of the MCPA:  the onus is on Plaintiffs to prove their claim, which (in this case) necessarily requires Plaintiffs to prove that the bed bugs came from RAC East's couch.

Even if a jury concludes that the infestation originated in the subject couch, there remains a second critical fact question:  did Myles's own negligence contribute to his injuries?  Under Maryland law,

> "a plaintiff's own conduct may constitute a bar to recovery if that plaintiff is determined . . . to also be guilty of negligence which was a direct contributing cause of the injury."  Likewise, in a breach of warranty claim, a plaintiff who uses a product with knowledge of its defect contributes to any ensuing injury from use of the product and is barred from recovery.

*Cantrell v. Wirtgen Am., Inc.*, Civ. No. CCB-07-2778, 2011 WL 915324, at *11 (D. Md. Mar. 15, 2011) (alteration in original) (citations omitted).  Myles acknowledged in his deposition that he placed his pallet "right in front of the couch," ostensibly so that he would not spread the insects throughout his apartment.  (ECF No. 92–2 at 14.)  He also admitted that he could have laid his pallet parallel to the couch against the opposing wall so that he would have been further

away from the bed bugs.  (*Id.* at 16.)   Nevertheless, he slept alongside the couch, and he

sustained ten bites that first night.  (*Id.*)  A jury might find Myles's explanation about containing

the infestation reasonable; a jury could alternatively conclude, however, that Myles behaved

unreasonably, particularly by choosing to sleep so close to the couch.  If a jury were to draw that

latter conclusion, Myles would presumably be barred from recovering for his injuries under the

contributory-negligence doctrine.[10]

Defendants suggest that Myles's knowledge of the infestation "extended to his children,

who were not initially home with him, but who . . . Myles brought back to his home on

November 10, 2014."  (ECF No. 89 at 19.)  According to Defendants, Plaintiffs A.M. and K.M.,

"through their father, assumed the risk of personal injury by entering a home and encountering a

Couch they knew, through their father, contained bed bugs."  (*Id.*)  Here, the Court disagrees

with Defendants:  pursuant to Md. Code Ann., Cts. & Jud. Proc. § 10-910, in an "action on

behalf of an infant to recover for death, personal injury, or property damage[,] the negligence of

the parent or custodian of the infant may not be imputed to the infant."   Although Maryland

courts have left open the possibility that a parent's negligence could be so severe as to displace

the negligence of the underlying tortfeasor, such circumstances are extraordinary and rare.

*Compare Caroline v. Reicher*, 304 A.2d 831, 834 (Md. 1973) ("[I]t is only in the somewhat

extraordinary situation where the parent's negligence is such as to constitute an independent and

superseding cause of the child's injuries, that the dormant negligent act of another is

discharged."), *with Halliday v. Sturm, Ruger & Co.*, 770 A.2d 1072, 1080 n.4 (Md. Ct. Spec.

---

[10] Myles's conduct could also be characterized as assuming the risk of injury.  However, the contributory-negligence and assumption-of-risk doctrines overlap considerably, and the outcome here would be the same:  Myles would be barred from recovering for his injuries.  *See Poole v. Coakley & Williams Constr., Inc.*, 31 A.3d 212, 224 (Md. 2011) ("Contributory negligence defeats recovery because it is a proximate cause of the accident which happens, but assumption of the risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs." (citation omitted)).

App. 2001) ("The relevant inquiry is 'whether what occurred reasonably was to have been anticipated as a result of . . . the defendant's acts or omissions . . . .'" (alterations in original) (citation omitted)).  Myles's conduct, in bringing his dependent children back to their home, does not constitute an "independent and superseding cause" of their injuries:  a lessor that rents out infested consumer merchandise can properly be charged with foreseeing the risk that members of the lessee's household will sustain bites.

Assuming, then, that a jury finds that the bed bugs were attributable to the RAC East sofa, Myles himself could nevertheless be barred from recovering on Counts I and II due to his personal negligence,[11] but his children would not be barred simply because he brought them back to their home.  However, should the jury find that (1) RAC East offered to remove the couch from Plaintiffs' apartment and (2) Myles refused, *all* Plaintiffs will be precluded from recovering for injuries solely attributable to the ongoing presence of the couch pursuant to the doctrine of avoidable consequences.[12]  *See Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 133 F. Supp. 2d 747, 757 (D. Md. 2001) ("Under Maryland law, a party . . . ha[s] a duty to mitigate damages under the doctrine of avoidable consequences." (citing *Sergeant Co. v. Pickett*, 401 A.2d 651, 652 (Md. 1979))), *reconsideration granted on other grounds*, 138 F. Supp. 2d 695 (D. Md. 2001); *Jones v. Malinowski*, 473 A.2d 429, 435 (Md. 1984) ("Our cases . . . recognize the doctrine of 'avoidable consequences' in tort actions—the duty to minimize damages—denying recovery of any damages that could have been avoided by reasonable conduct on the part of the plaintiff."); Restatement (Second) of Torts § 918 (Am. Law Inst. 1979) ("[O]ne injured by the

---

[11] Although a plaintiff's contributory negligence may bar recovery on a common-law negligence or breach-of-warranty theory, Maryland courts have not clarified whether contributory negligence is an affirmative defense to an MCPA claim for personal injury.  *See Benik v. Hatcher*, 750 A.2d 10, 34 n.4 (Md. 2000) (Rodowsky, J., dissenting).

[12] In so holding, the Court acknowledges that the jury may struggle, as a practical matter, to determine the extent to which the ongoing presence of the couch contributed to or worsened Plaintiffs' injuries.  Indeed, questions of causation and timing can prove thorny, but that is precisely why these questions are properly reserved for a jury to sort out in light of trial testimony rather than for the Court to resolve on summary judgment.

tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.").

Unfortunately, the Court cannot conclusively determine from this record whether/when Myles declined RAC East's offer. Myles himself testified that he told the RAC East crew who visited his apartment on November 10, 2014, to leave the couch in his apartment until Terminix completed its inspection. (ECF No. 92–2 at 20.) However, Amber Blake Johnson (one of the crew members) recalled that she and Dante Johnson, another crew member, told Myles they could not remove the sofa until Terminix reported back to RAC East. (ECF No. 89–8 at 6.) The record is further muddled by contrary statements about RAC East's subsequent attempts to retrieve the sofa. According to Myles, "Mike" had promised (but failed) to have the couch removed on November 17, 2014; Myles further testified that (1) he spoke with "Mike" on November 18, 2014; (2) "Mike" represented that someone would pick up the couch within a couple of days; but (3) Myles never heard back (though Myles also admitted that he never attempted to contact the store again). (ECF No. 92–2 at 28-30, 33.) However, David Johnston testified that his team "tried at least four times" to pick up the couch but that Myles "refused to return it." (ECF No. 92–4 at 6-7.) And Jason Parrott testified that Myles initially refused to surrender the couch as he "wanted to wait until Terminix came and did the inspection" and that the RAC East crew "came out a few times after that, and he wasn't available, so [they] never picked the couch up." (ECF No. 89–5 at 19.) As noted above, it is not even clear what ultimately became of the couch: Mike Boyd averred that he and "Darnell" collected the couch and "dumped it" (ECF No. 92–3 at 6), whereas Myles insisted that he arranged for a gentleman in his community to remove it (ECF No. 92–2 at 30). All of these factual inconsistencies will require jury analysis: they cannot be resolved on summary judgment. But assuming this case

actually proceeds into a trial posture, the parties are on notice that the Court will instruct the jury not to award any damages to Plaintiffs for injuries that could have been avoided, provided the jury finds that RAC East offered to remove the couch and Myles declined.

### VI.   Conclusion

For the foregoing reasons, an Order shall enter DENYING Plaintiffs' Motion for Partial Summary Judgment (ECF No. 88); GRANTING IN PART and DENYING IN PART Defendants' Motion for Summary Judgment (ECF No. 89); and TERMINATING Defendant RAC from these proceedings.

DATED this 19th day of July, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge